**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

JULIA M. GITTMAN-CROWTHER,          )
                                    )
              Plaintiff,            )
                                    )
       v.                           )          Civil Action No. 19-1630-CFC-SRF
                                    )
ANDREW SAUL,                        )
Commissioner of Social Security,    )
                                    )
              Defendant.            )

## <u>REPORT AND RECOMMENDATION</u>

### I.  INTRODUCTION

Plaintiff Julia M. Gittman-Crowther ("Gittman-Crowther") filed this action on March 13, 2020, against the defendant Andrew Saul, the Commissioner of the Social Security Administration (the "Commissioner").  Gittman-Crowther seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's June 15, 2018 final decision, denying Gittman-Crowther's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434.

Currently before the court are cross-motions for summary judgment filed by Gittman-Crowther and the Commissioner.[1]  (D.I. 14; D.I. 16) Gittman-Crowther asks the court to reverse the Administrative Law Judge's ("ALJ") decision or remand her case for further administrative proceedings.  (D.I. 15 at 24) The Commissioner requests the court affirm the ALJ's decision.  (D.I. 17 at 24) For the reasons set forth below, the court recommends DENYING Gittman-

---

[1] The briefing for the present motions is as follows:  Gittman-Crowther's opening brief (D.I. 15) and the Commissioner's combined opening brief in support of his motion for summary judgment and answering brief.  (D.I. 17) Gittman-Crowther stands upon her opening brief.  (D.I. 18)

Crowther's motion for summary judgment (D.I. 14) and GRANTING the Commissioner's cross-motion for summary judgment.  (D.I. 16)

## II.   BACKGROUND

### a.  Procedural History

Gittman-Crowther filed a DIB application on August 27, 2015, claiming a disability onset date of November 1, 2007.  (D.I. 9-3 at 19) Her claim was initially denied on November 19, 2015 and again after reconsideration on March 14, 2016.  (D.I. 9-4 at 4-9, 11-16) Gittman-Crowther then filed a request for a hearing, which occurred through video-teleconference on May 7, 2018.[2]  (D.I. 9-2 at 15) Administrative Law Judge Jack Penca issued an unfavorable decision, finding that Gittman-Crowther was not disabled under the Act on June 15, 2018.  (*Id.* at 24) The Appeals Council subsequently denied Gittman-Crowther's request for review on June 28, 2019, rendering the ALJ's decision the final decision of the Commissioner.  (*Id.* at 2-4)

On August 13, 2018, Gittman-Crowther brought a civil action in this court challenging the ALJ's decision that she was not under a disability within the meaning of the Act from November 1, 2007, through March 31, 2013, the date she was last insured.  (D.I. 9-5 at 39-44) On March 13, 2020, Gittman-Crowther filed a motion for summary judgment, and on May 12, 2020, the Commissioner filed a cross-motion for summary judgment.  (D.I. 14; D.I. 16)

---

[2] The first hearing, held via video-teleconference on January 29, 2018, was adjourned to give Gittman-Crowther's new attorney a chance to familiarize himself with the case.  (D.I. 9-2 at 38-41)

### b. Medical History

Gittman-Crowther was born on December 19, 1969 and was 37 years old on her alleged disability onset date.  (D.I. 9-3 at 19) Gittman-Crowther graduated from college with a bachelor's degree in nursing.  (D.I. 9-2 at 23) Gittman-Crowther previously worked full-time as a school nurse and a staff nurse, before taking a position as a substitute school nurse from October 2010 to June 2011.  (D.I. 9-7 at 17) The ALJ concluded that Gittman-Crowther has the following severe impairments: peritoneal adhesions, irritable bowel syndrome, and degenerative disc disease of the cervical spine.  (D.I. 9-2  at 17)

Gittman-Crowther had a history of abdominal surgeries prior to the alleged onset date, including two lyses of adhesions, two Cesarean sections, and status post total abdominal hysterectomy and bilateral salpingo-oophorectomy.  (D.I. 9-9 at 33) The most recent of these surgeries was performed in 2004.  (*Id.*) She was diagnosed with fibromyalgia in 2007.  (D.I. 10-20 at 98) On January 9, 2008 she visited Dr. George Benes ("Dr. Benes"),[3] who noted "stool blockage 2/3 way up" her colon and a distended abdomen.  (D.I. 10-15 at 3) Three days later, Dr. Benes performed a colonoscopy on Gittman-Crowther after which he noted that he felt her symptoms were due to IBS and prescribed her Librax and Amitiza.  (D.I. 10-15 at 4-5)

On January 15, 2008 Gittman-Crowther presented at the ER with severe abdominal pain, for which she was treated with IV Dilaudid and daily enemas.  (D.I. 9-9 at 15) A CT scan of her abdomen and pelvis showed no acute abnormalities.  (D.I. 9-9 at 9) When her pain did not resolve, Dr. Robert Guilday ("Dr. Guilday") performed an exploratory laparoscopy and lysis of adhesions on January 23, 2008, and she was discharged the following day because her condition

---

[3] Dr. Benes was Gittman-Crowther's initial treating gastroenterologist who saw her from January 9, 2008 until at least August 6, 2013.  (D.I. 10-15 at 7-24)

had improved.  (*Id.*) On February 26, 2008, Dr. Benes wrote a letter to Gittman-Crowther's primary care physician, Dr. Rhonda Barnett-Smith, stating that he felt her symptoms were a result of IBS and that he increased her Librax prescription to twice a day and continued her Amitiza prescription.  (D.I. 10-15 at 6) Dr. Benes also recommended over-the-counter medications Miralax and Senokot.  (*Id.* at 11)

On February 3, 2009, Gittman-Crowther was evaluated by gastroenterologist Dr. Prasad Kanchana ("Dr. Kanchana") for a second opinion.  (D.I. 10-5 at 15-16) Dr. Kanchana described Gittman-Crowther's symptoms as "multifactorial from IBS, multiple surgery, adhesions, etc." (*Id.*) Notes from the visit indicate that Gittman-Crowther took Amatiza, Librax, Miralax and Senokot for her symptoms.  (*Id.*) Symptoms reported included abdominal pain, constipation, diarrhea, and urinary retention.  (*Id.*)  Dr. Kanchana's examination revealed "non-specific tenderness in [Gittman-Crowther's] lower abdomen, no rebound tenderness, no hepatosplenomegaly" and she exhibited no clubbing edema and normal gait.  (*Id.*) Dr. Kanchana recommended a high-fiber diet for her IBS in addition to continued use of Amitiza and Miralax. (*Id.*)

In his notes on May 20, 2010, Dr. Benes mentions Gittman-Crowther having diarrhea ten times a day.  (D.I. 10-15 at 12) An abdominal and pelvic CT was performed on November 30, 2011, which yielded unremarkable results.  (D.I. 9-16 at 36) On December 6, 2011, Dr. Benes performed another colonoscopy on Gittman-Crowther and discovered diffuse melanosis coli indicating chronic laxative usage, small internal hemorrhoids, and adhesions, although Dr. Benes remained unsure as to what was causing her symptoms.  (D.I. 10-15 at 13)

Gittman-Crowther presented at the ER on January 16, 2012 with abdominal pain.  (D.I. 9-17 at 3) At the time, she had a laparoscopic lysis of adhesions scheduled with Dr. Guilday, but

she went to the ER when she experienced significant increasing pain despite taking two Vicodin every four hours.  (*Id.*) A physical examination revealed "soft, nondistended, positive tenderness in the right lower and left quadrants" of her abdomen and positive voluntary guarding bilaterally in her lower abdominal quadrants.  (*Id.* at 4) An abdominal X-ray performed that same day found a small amount of stool in her descending colon and scattered air-fluid levels, but no abnormally dilated air-fluid loops of bowel, free intraperitoneal air, or abnormal calcifications.  (D.I. 9-16 at 31) She was treated with analgesics and was discharged the following day with instructions to follow up with Dr. Guilday the next week.  (D.I. 9-17 at 4)

 Her condition was described by Dr. Benes as "doing very well overall" on March 8, 2012.  (D.I. 10-15 at 17) Several months later, on September 4, 2012, Gittman-Crowther relayed to Dr. Benes that she had been experiencing worsening symptoms and had stopped her medications the night before.  (D.I. 10-15 at 15-16) On examination, Gittman-Crowther's abdomen was soft and nontender with no mass normal bowel sounds.  (*Id.* at 16) Dr. Benes attributed this flare-up to a probable gastrointestinal virus and recommended she resume her medication when she felt better.  (*Id.*)

On February 7, 2013, Gittman-Crowther reported worsening symptoms which were attributed to situational stressors.  (D.I. 10-15 at 18) Dr. Benes performed a physical examination, noting that Gittman-Crowther's abdomen was soft and non-tender with normal bowel sounds.  (*Id.* at 18-19) But in March of 2013, Gittman-Crowther visited the ER twice with abdominal pain.  (D.I. 10-6 at 27, 37) During the first visit on March 12, 2013, she reported pain in her lower left abdomen, "seedy" stools, and nausea.  (*Id.* at 37) An abdominal and pelvic CT scan revealed no acute intra-abdominal process, and she was discharged.  (*Id.* at 41-42) On March 23, 2013 she again presented at the ER reporting pain in her left abdomen.  (*Id.* at 27) An

X-ray showed no acute intra-abdominal process, and all labs and objective testing were normal despite notes indicating her "quite dramatic" expression of pain.  (*Id.* at 31, 35) March 31, 2013 was the date Gittman-Crowther was last insured under the Social Security Act, marking the end of the relevant period.  (D.I. 9-2 at 17)

Gittman-Crowther's medical history after her date last insured shows she continued to experience symptoms related to her IBS and constipation.[4]  On June 19, 2013 Dr. Benes performed an esophogastroduodenoscopy ("EGD") where normal mucosa was found in the stomach and duodenum, and pink island of mucosa was found in the esophagus that was compatible with the rest but overall was unremarkable.  (D.I. 10-15 at 20-21) During a clinical visit on August 6, 2013 Gittman-Crowther indicated that she was taking Amitiza, Miralax and Senokot, and Dr. Benes opined that stress may be playing a role in her symptoms.  (*Id.* at 22-23) She presented at the hospital in November of 2013 with a small bowel obstruction, and she presented again on December 16, 2013 with abdominopelvic pain.  (D.I. 9-11 at 5) A diagnostic laparoscopy was performed on Gittman-Crowther by Dr. Guilday on January 15, 2014 and an abdominal wall mass on the lower left quadrant was located, biopsied, and determined to be soft tissue.  (*Id.* at 37, 51-53) In his notes from January 7, 2014, Dr. Kanchana referenced Gittman-Crowther's stay at the hospital in November 2013 and noted that she continues to have "constipation vs. diarrhea" and takes Amitiza, Senokot, and Miralax for her symptoms.  (D.I. 10-5 at 13) He diagnosed Gittman-Crowther with IBS, constipation and small bowel obstruction and continued her treatment with Amitiza and Miralax.  (*Id.*)

---

[4] Gittman-Crowther was last insured for the purposes of this Act as of March 31, 2013.  (D.I. 9-2 at 17) However, the court reviews medical history relating to Gittman-Crowther's gastrointestinal conditions in the year following her date last insured because Gittman-Crowther contests the ALJ's assessment of findings relating to her symptoms during this time period.  (D.I. 15 at 21-22)

On March 20, 2014, Dr. Guilday performed surgery on Gittman-Crowther for a partial small-bowel obstruction and intraperitoneal adhesions.  (D.I. 9-14 at 61) The operation included an exploratory laparotomy with extensive lysis of adhesions, resection of distal small bowel and cecum with primary stapled anastomosis and Seprafilm placement for adhesion prevention.  (*Id.*) Dr. Guilday attempted to dissect Gittman-Crowther's small bowel, but there were several loops of small bowel adherent to themselves with "extremely dense" adhesions, necessitating a distal small bowel resection.  (D.I. 9-14 at 62) A "7 x 4 cm portion of cecum and ascending colon, with attached 30-40 cm segment of ileum" was sent to pathology after Gittman-Crowther's surgery. (*Id.* at 66) Pathology determined the specimens showed "convoluted tortuous loops encased in hemorrhagic and fibrous adhesions, with associated mural kinking and luminal obstruction." (*Id.*)

Throughout the relevant period from November 1, 2007 to March 31, 2013, Gittman-Crowther also reported pain in her head and neck, and she was treated for generalized anxiety disorder and depressive disorder with therapy and medication.[5]  (D.I. 10-14 at 3-5; D.I. 10-7 at 2-97) Because the parties do not challenge the sufficiency of the ALJ's findings with respect to these conditions, the court does not offer a further summary of the medical records addressing them.  (D.I. 15; D.I. 17)

In a September 16, 2015 functional report, Gittman-Crowther outlined her daily routine as waking up to ensure her son leaves for school on time, attending to her pets, and going back to

---

[5] The ALJ concluded that Gittman-Crowther's cervical degenerative disc disease did not meet severity of the listed impairments in 20 C.F.R. Part 4040, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526), and that her medically determinable mental impairments were nonsevere.  (D.I. 9-2 at 18-19) In finding that Gittman-Crowther's mental impairments were nonsevere, the ALJ gave no weight to the state agency's mental assessments, and the parties do not challenge the sufficiency of this finding.  (D.I. 9-2 at 18; D.I. 15; D.I. 17)

bed for a couple hours before showering, getting dressed, and taking her Relistor shot.  (D.I. 9-7 at 67-69) After that, her day varied depending on her bowel movements, but she described sometimes doing light household work such as dusting, wiping counters, or small loads of laundry, typically falling asleep at least once during the day, and tending to her son once he came home from school.  (*Id.* at 69) She reported that she could no longer change litter boxes or sometimes feed her animals on her own, and her pain affected her ability to sleep and stay asleep.  (*Id.* at 63) She did not often go outside due to the unpredictability of her medications and digestive system.  (*Id.* at 64-65) She stated that, although she was unable to stand for long periods of time, she could prepare her own meals, do light cleaning, and food shop with her husband.  (*Id.*) She represented that she could walk for about a block before needing to stop and rest for two to ten minutes, and that her ability to pay attention and follow written or spoken instructions depended on her pain level and medication.  (*Id.* at 67)

Gittman-Crowther also completed a pain questionnaire in which she described an "aching, deep, constant sharp-gnawing pain" in the lower left portion of her abdomen.  (*Id.* at 48) She stated that the pain was constant except when she was sleeping, and that walking or driving long distances, standing or sitting for too long, stooping, carrying, pushing, pulling, and movement all worsened her pain.  (*Id.*) She described her pain as sometimes moving to her pelvic region, worsening over the last twelve months as her gastrointestinal issues worsened. (*Id.*) Her pain limited her ability to work, grocery shop, attend family or school events, make plans, engage in sexual activity, or do chores or recreational activities.  (*Id.* at 49) She reported taking morphine and Dilaudid for her pain, and she described her unsuccessful efforts to relieve her pain through hypnosis and acupuncture.  (*Id.* at 48)

On November 18, 2015, Dr. Joseph Michel ("Dr. Michel"), a state agency medical consultant, opined that Gittman-Crowther had the residual functional capacity ("RFC") to perform work at the light exertional level.  (D.I. 9-3 at 10-13) Specifically, Dr. Michel concluded that Gittman-Crowther could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds.  (*Id.* at 11) Furthermore, he stated that Gittman-Crowther could stand, walk, and sit for approximately six hours in an eight-hour workday.  (*Id.* at 11-12) He determined that Gittman-Crowther could climb ramps and stairs frequently, climb ladders, ropes and scaffolds occasionally, balance, stoop, kneel, crouch and crawl occasionally.  (*Id.* at 12) He also stated that Gittman-Crowther should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards.  (*Id.* at 12-13) In his opinion, Gittman-Crowther had medically determinable impairments ("MDI") that could cause symptoms and dysfunction, but her "statements concerning her symptoms and effects are partially credible and not consistent with near normal physical and functional exam by neurologist."  (*Id.* at 14)

Dr. Kanchana summarized his treatment of Gittman-Crowther on April 9, 2018, opining that Gittman-Crowther could not engage in any substantial activity before and as of March 31, 2013.[6]  (D.I. 10-21 at 14) He determined that Gittman-Crowther could not work continuously for more than one to two hours, she would need multiple bathroom breaks throughout the day, she would have difficulty trying to perform a job that required sitting or standing for a substantial period of time, and she would likely need to be absent multiple days a week or otherwise not available during scheduled hours.  (*Id.* at 14-15) Dr. Kanchana's responses to a physical RFC

---

[6] March 31, 2013 was Gittman-Crowther's last date insured and was therefore the end of the relevant period.  (D.I. 9-2 at 17)

questionnaire form was consistent with these representations, reiterating that Gittman-Crowther's symptoms were severe enough to interfere with the attention and concentration needed to perform even simple work tasks, and she would be incapable of tolerating even "low stress" jobs because "any amount of stress will contribute to symptoms." (D.I. 10-21 at 16-19) Dr. Kanchana again outlined Gittman-Crowther's postural limitations and determined that she would need a job with significant postural and attendance accommodations. (*Id.* at 17-19) Dr. Kanchana's completion of a Gastritis/Irritable Bowel Syndrome Medical Assessment Form further confirmed his assessment of Gittman-Crowther's symptoms of pain, fatigue, and medication side effects, and the impact of these conditions on her ability to perform even simple work tasks during a typical workday. (*Id.* at 20-21) He opined that Gittman-Crowther's limitations affecting her ability to work a regular job on a sustained basis included "chronic constipation, chronic diarrhea, severe abdominal pain, nausea, vomiting, fatigue, [and] weakness." (*Id.* at 22)

### c. **Hearing Before ALJ Penca**

#### i. **Gittman-Crowther's Testimony**

At the hearing before the ALJ on May 7, 2018, Gittman-Crowther testified that she currently lives with her husband and her eighteen-year-old son, the highest level of education she received was a bachelor's degree in nursing, and the last time she worked was 2013. (D.I. 9-2 at 47) She stated that from 2010 to 2013, she was a substitute nurse and her hours varied from week to week. (*Id.* at 47-48) As a substitute nurse, she had the flexibility to tell her employer when she was unable to work, and her employer stopped calling when she reported that she could no longer continue to work. (*Id.* at 48) The last time she held a full-time position was in 2007, when she was a labor and delivery registered nurse. (*Id.* at 48-49) She testified that she has been

unable to work full-time since then due to the unpredictability of her bowels, as well as her nausea, vomiting, and anxiety.  (*Id.* at 49)

Gittman-Crowther's testimony before the ALJ regarding her symptoms was consistent with her description of symptoms to Dr. Kanchana during her February 2009 evaluation and to Dr. Benes during her May 2010 appointment.  (*Id.* at 49-50; D.I. 10-5 at 15-16; D.I. 10-15 at 12) Since March 31, 2013, Gittman-Crowther says things have gotten worse and she now fluctuates between complete constipation and complete diarrhea.  (D.I. 9-2 at 50) Although this fluctuation also occurred prior to March 31, 2013, she now experiences more constipation, with symptoms including a swollen-feeling belly, feeling pressure on her rectum, and unsuccessful trips to the bathroom.  (*Id.*)

Gittman-Crowther described her pain as a chronic aching in her lower left stomach that would turn into stabbing waves, with cramp-like pain similar to strong labor contractions when she had diarrhea.  (*Id.* at 51) Gittman-Crowther's testimony regarding her pain levels and daily activities was consistent with her responses to the September 16, 2015 functional report and pain questionnaire.  (*Id.* at 51-52; D.I. 9-7 at 48-69)  She recalled that she experienced infrequent vomiting and nausea mainly when she had a bowel obstruction prior to March 31, 2013, but these symptoms increased in frequency after her surgery in 2014.  (D.I. 9-2 at 52-53)

Gittman-Crowther's testimony before the ALJ concerning her postural limitations was consistent with those described in Dr. Kanchana's April 9, 2018 letter.  (*Id.* at 53-55; D.I. 10-21 at 14-15) Gittman-Crowther testified that, prior to March 31, 2013, she would not have been able to work full-time at a job where she could sit or stand, adjust her position as much as she needed, and do nothing but a very simple task because she uses the bathroom too much and her pain interfered with her ability to interact with others.  (*Id.* at 62) She stated that when she stopped

working full time, she was unable to attend many of her children's activities even though she

was home.  (*Id.* at 63)

### ii.  Vocational Expert's Testimony Before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("VE"):

> What I would like you to do, Ms. Cody is to assume an individual of the claimant's age, education and work history who can perform work at the light exertional level, who could frequently climb ramps and stairs and occasionally ladders, ropes and scaffolds, who could occasionally balance, stoop, kneel, crouch and crawl and could have occasional exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dust, gas, poor ventilation and hazards, and who could have no exposure to a noise level greater than that found in the typical office environment. Could this individual perform the claimant's past work?

(D.I. 9-2 at 66)  The VE testified that this individual would not be able to perform Gittman-

Crowther's past relevant work as a nurse.[7]  (*Id.* at 66) However, the VE testified that this

individual would be able to perform work as a final inspector, inserter, or routing clerk at the

light level of exertion.  (*Id.* at 66-67) The ALJ asked whether the individual's ability to be

employed would be affected if, due to pain, they were off task fifteen percent or more of the

workday.  (*Id.* at 67) The VE testified that this limitation would be preclusive.  (*Id.*) The ALJ

inquired how needing to take three additional twenty-minute breaks each workday would affect

an individual's employability.  (*Id.*) The VE testified that the number of breaks would be

considered excessive by employers and would be work preclusive.  (*Id.*) The VE further stated

that she did not see any conflict between the limitations the ALJ gave her and requirements of

the jobs she cited.  (*Id.* at 67-68)

---

[7] Although Gittman-Crowther's past work as a full-time school nurse from 2002 to 2003 would be past relevant work, she did not work at that position for the required length of time.  (D.I. 9-2 at 64-65) Therefore, the ALJ concluded that Gittman-Crowther's only past relevant work that met the substantial gainful activity ("SGA") level was her position as a full-time staff nurse until 2007.  (*Id.*)

Gittman-Crowther's attorney asked whether a hypothetical individual who was absent on a consistent but unscheduled basis for two or more times per month could maintain full-time work.  (*Id.* at 68) The VE testified that the individual would not be able to maintain employment. (*Id.*) Gittman-Crowther's attorney asked whether a hypothetical individual who could not sit, stand and walk a combined eight hours could perform full-time work.  (*Id.*) The VE testified that the individual would not be able to maintain employment.  (*Id.*)

### d.  The ALJ's Findings

Based on the factual evidence in the record and the testimony by Gittman-Crowther and the VE, the ALJ determined that Gittman-Crowther was not disabled under the Social Security Act for the relevant time period from November 1, 2007, the alleged onset date of the disability, through March 31, 2013, the date last insured.  (D.I. 9-2 at 24) The ALJ found in pertinent part:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2013.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of November 1, 2007 through her date last insured of March 31, 2013 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: peritoneal adhesions, irritable bowel syndrome, and degenerative disc disease of the cervical spine (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she could frequently climb ramps and stairs, occasionally climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and could have only occasional exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, and no exposure to a noise level greater than that found in a typical office environment.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December 19, 1969 and was 43 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from November 1, 2007, the alleged onset date, through March 31, 2013, the date last insured (20 CFR 404.1520(g)).

(*Id.* at 17-24)

## III.   STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190-91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence.  *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)).  As the United States Supreme Court has explained, substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted); *Biestek*, 139 S. Ct. at 1154.

Thus, in the context of judicial review under § 405(g):

[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).  Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record."  *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefits cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'"  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).  "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g)

affirm, modify, or reverse the [Commissioner]'s decision with or without a remand to the [Commissioner] for a rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV.   DISCUSSION

### a.   Disability Determination Process

The core issue in this case is whether Gittman-Crowther was disabled within the meaning of the Act at any time from November 1, 2007, the alleged onset date of the disability, through March 31, 2013, the date last insured.  (D.I. 9-2 at 24) Title II of the Social Security Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (citing 42 U.S.C. § 423(a)(l)(D) (2015)).  A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(l)(A).  A claimant is only disabled if her impairments are so severe that she is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *See id.* § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).  To qualify for disability insurance benefits, a claimant must establish that he or she was disabled prior to the date he was last insured. *See* 20 C.F.R. § 404.131 (2016); *Matullo*, 926 F.2d at 244.

The Commissioner must perform a five-step analysis to determine whether a particular claimant has met his or her burden of establishing disability. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).  If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i).  At step

one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity.  *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity).  If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments.  *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe).  If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work.  *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428.  When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If a claimant's impairment, either individually or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five.  *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the RFC to perform her past relevant work.  *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428.  A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001).  The claimant bears the burden of demonstrating the inability to return to past relevant work.  *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude her from adjusting to any other available work.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-

disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428.  In other words,

the Commissioner must prove that "there are other jobs existing in significant numbers in the

national economy which the claimant can perform, consistent with her medical impairments, age,

education, past work experience, and [RFC]."  *Plummer*, 186 F.3d at 428.  The ALJ must

analyze the cumulative effect of all the claimant's impairments in determining whether she is

capable of performing work and is not disabled.  *See id.*  The ALJ often seeks the VE's

assistance in making this finding.  *See id.*

### b.  Whether the ALJ's Decision is Supported by Substantial Evidence

In his June 15, 2018 written decision, the ALJ found that Gittman-Crowther was not

disabled from the alleged disability onset date of November 1, 2007 through the date last insured

on March 31, 2013.  (D.I. 9-2 at 24) The ALJ concluded that, despite Gittman-Crowther's severe

impairments (peritoneal adhesions, irritable bowel syndrome, and degenerative disc disease of

the cervical spine), she had the RFC to perform a range of light work activity with additional

non-exertional limitations.[8]  (*Id.* at 23)  Gittman-Crowther asserts four main arguments on

appeal:  (1) the ALJ failed to take into account parts of the VE's testimony in his determination

of Gittman-Crowther's limitations, (2) the ALJ failed to take into account medical evidence,

including the natural result of Gittman-Crowther's documented symptoms and findings of her

bowel resection surgery after her date last insured, (3) the ALJ erred in concluding that Dr.

Kanchana's opinions as to Gittman-Crowther's limitations did not apply through March 2013,

and (4) the administrative hearing process was defective and the ALJ artificially limited the

evidentiary record.  (D.I. 15 at 18-23)

---

[8] Additional non-exertional limitations include lifting twenty pounds only occasionally, ten
pounds regularly, standing and walking a combined total of only six hours a day as well as
postural and environmental limitations.  (D.I. 9-2 at 22)

### i.  Vocational Expert Testimony

Gittman-Crowther argues that the ALJ's conclusion is not supported by substantial evidence because he failed to consider the VE's testimony as to the preclusive nature of hypothetical limitations.  (D.I. 15 at 16) Specifically, Gittman-Crowther points to testimony indicating that "work preclusive" circumstances include being off task fifteen percent or more of the workday, needing to take three twenty-minute breaks each workday, being consistently absent on an unscheduled basis two or more times a month, or being unable to sit, stand and walk a combined eight hours per day.  (D.I. 9-2 at 67-68) Gittman-Crowther contends that her symptoms would naturally result in needing multiple trips to the bathroom throughout the day that would be longer than twenty minutes, and the fact that the ALJ did not consider this in his conclusion renders his decision unsupported by substantial evidence.  (D.I. 15 at 18)

The Third Circuit has held that "[a] hypothetical question must reflect *all* of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."  *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) (internal quotations omitted) (emphasis in original) (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)).  The Third Circuit has also recognized that in order "to accurately portray a claimant's impairments, the ALJ must include all '*credibly established limitations*' in the hypothetical."  *Zirnsak v. Colvin*, 777 F.3d 607, 614 (3d Cir. 2014) (emphasis in original).  "[L]imitations that are supported by medical evidence and are 'otherwise uncontroverted in the record' *must* be included in the ALJ's hypothetical for us to rely on the VE's response to that hypothetical."  *Id.* (emphasis in original).

 If a limitation is supported by medical evidence, but opposed by other evidence in the record, "the ALJ has discretion to choose whether to include that limitation in the hypothetical."

*Id.* at 615.  "[T]he ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible."  *Id.* The ALJ has the authority to disregard hypotheticals asked to the VE if they are inconsistent with the evidence on record. *Jones*, 364 F.3d at 506-507 (finding that the ALJ did not err in failing to accept a hypothetical posed to the VE because it was inconsistent with evidence on record).

Here, the ALJ reasonably found that Gittman-Crowther's statements about her degree of pain and functional limitations were inconsistent with medical evidence during the relevant period.  (D.I. 9-2 at 20) In making this assessment, the ALJ looked to objective medical testing, including imaging studies of Gittman-Crowther's abdomen and gastrointestinal tract, physical examinations and X-rays of her lumbar spine and lower extremities which all yielded normal results.  (*Id.* at 22) He concluded that her physician's notes are not reflective of her testimony on time spent in the bathroom.  (*Id.*)

The ALJ properly exercised his discretion in finding that Gittman-Crowther's subjective complaints were inconsistent with the objective medical evidence on the record.  Because Gittman-Crowther's statements concerning time spent in the bathroom were controverted by other evidence on the record, it was within the ALJ's discretion whether to credit hypotheticals posed to the VE concerning bathroom breaks.  Therefore, the court recommends denying Gittman-Crowther's motion for summary judgment and granting defendant's motion for summary judgment.

### ii.  Medical Evidence

Gittman-Crowther argues that the ALJ failed to properly address consistencies between the medical record and her testimony about time spent in the bathroom.  (D.I. 15 at 20) Further, Gittman-Crowther argues that the ALJ failed to reconcile her symptoms during the relevant

period with findings from her bowel resection surgery after the relevant period.[9]  (*Id.* at 21) As

for the first contention, Gittman-Crowther states that her testimony regarding the impact of her

symptoms and the amount of time she would spend in the bathroom is consistent with the natural

result of her documented diagnosis and related symptomology.  (*Id.* at 20)

Although the ALJ need not reference every medical record on file in his decision, he is

expected to provide a reasoning for his conclusions when conflicting evidence is presented.

*Fargnoli*, 247 F.3d at 42.  In finding that Gittman-Crowther's statements about the degree,

consistency and limiting effects of her symptoms were contrary to the record, the ALJ did a

comprehensive review of her medical history, daily life, and a state agency physical assessment

indicating her capacity for work.  (D.I. 9-2 at 19-23)

The ALJ evaluated medical evidence concerning Gittman-Crowther's gastrointestinal

symptoms when determining her RFC.  (*Id.* at 20-22) In his evaluation, the ALJ looked to ER

visits in 2008 for severe abdominal pain in which CT scans and X-rays failed to present

abnormalities or obstructions, Gittman-Crowther underwent laparoscopic lysis of adhesions, and

a questionable diagnosis of IBS was noted.  (*Id.* at 20-21) Gittman-Crowther presented at the ER

in 2011 and 2012 for pain and again X-rays were normal.  (*Id.* at 21; D.I. 9-10 at 18; 9-16 at 31,

36) In 2012, Gittman-Crowther said she was "doing very well overall" although she reported

bouts of diarrhea that were attributed to a virus in September 2012, and her symptoms worsened

due to situational stressors by February 2013.  (D.I. 10-15 at 15-19) In March of 2013 Gittman-

---

[9] Gittman-Crowther suggests that these later findings place her symptoms during the relevant period in context because they establish an explanation for her prior chronic constipation with bouts of diarrhea.  (D.I. 15 at 21-22) Gittman-Crowther acknowledges that diagnostic testing performed during the relevant period did not reveal the bowel twisting discovered during her later surgery, but rather argues that her symptomology during the relevant period could be a natural result of this phenomenon.  (*Id.*)

Crowther presented at the ER twice for abdominal pain, but X-rays and CT scans were again normal, with attending staff noting during one visit that Gittman-Crowther was "quite dramatic" in her expression of pain.  (D.I. 10-6 at 27-32, 37-41) Overall, the ALJ found that objective medical evidence, including normal imaging studies of Gittman-Crowther's abdomen and gastrointestinal tract, insignificant examination findings, normal X-rays of her lumbar spine and lower extremities all refuted her subjective claims as to the extent of her limitations.  (D.I. 9-2 at 22)

The ALJ also examined Gittman-Crowther's activities of daily living and determined that her statements regarding the extent of her symptoms were unsupported by these records.  (*Id.*) Records of Gittman-Crowther's activities included traveling, taking a cruise, walking two miles a day on a treadmill, and participating in aqua therapy during the relevant period.  (D.I. 10-8 at 14; D.I. 10-7 at 78; D.I. 10-14 at 36) From these findings the ALJ concluded that Gittman-Crowther's statements concerning her symptoms were inconsistent with her account of the limiting effects of her symptoms.  (D.I. 9-2 at 22)

The ALJ also weighed medical opinions in his consideration, giving no weight to the medical source statements completed by Gittman-Crowther's treating gastroenterologist in April 2018 for the reasons discussed below, and giving great weight to the state agency physical assessment.  (*Id.*; *See* 20 C.F.R. § 404.1527 (outlining the ALJ's process for weighing medical opinions.)). In his opinion, state-agency expert Dr. Michel determined that Gittman-Crowther could perform light work; frequently climb ramps and stairs; occasionally balance, stoop, kneel, crouch, crawl, climb ladders, ropes, and scaffolds; and must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, noise, vibrations, pulmonary irritants, and hazards.  (D.I. 9-3 at 11-13) In giving great weight to this medical opinion, the ALJ stated that

the objective medical evidence supported this opinion, and he found no need for more restrictive RFC limitations during the relevant period.  (D.I. 9-2 at 22-23) "[A]n ALJ need not explicitly discuss each [20 C.F.R. § 404.1527(c)] factor in his decision…Instead, an ALJ need only explain his evaluation of the medical evidence for the district court to meaningfully review whether his reasoning accords with the regulation's standards."  *Samah v. Comm'r of Soc. Sec.*, 2018 WL 6178862, at *5 (D.N.J. Nov. 27, 2018) (internal quotation marks and citations omitted).  The ALJ satisfied this requirement by indicating that the medical evidence supported Dr. Michel's opinion, and contradicted Dr. Kanchana's opinion, when he decided to give no weight to Dr. Kanchana's opinion and great weight to Dr. Michel's opinion.  (D.I. 9-2 at 22)

Additionally, Gittman-Crowther argues that the ALJ failed to reconcile her treatment for IBS and associated symptoms of chronic constipation and bouts of diarrhea through March 31, 2013 with the findings of her bowel resection surgery in March 2014.  (D.I. 15 at 21) Gittman-Crowther alleges that the findings from her March 2014 surgery clarified why she had been suffering from gastrointestinal symptoms in previous years.  (*Id.*) She argues that the ALJ neglected to investigate her entire medical picture by failing to consider the importance of these findings. (*Id.* at 22)

The ALJ is not required to consider "every piece of evidence in the record."  *Pintal v. Comm'r of Soc. Sec.*, 602 F. App'x 84, 88 (3d Cir. 2015).  Here, Gittman-Crowther has not shown that findings from her surgery in 2014 were connected to her symptoms during the relevant period.  Testing done throughout the relevant period showed no indication of twisting in her bowels.  (See D.I. 9-10 at 18; 9-16 at 31, 36; D.I.10-5 at 13; D.I. 10-6 at 27-32, 37-41) The record indicates that her condition worsened in December of 2013, after her date last insured, and this prompted the March 2014 surgery to be performed.  (D.I. 9-11 at 5) Therefore, the ALJ

was within his authority to conclude that findings from the March 2014 surgery did not have a clear association with Gittman-Crowther's symptoms during the relevant period, and the ALJ was not required to cite them in his decision.

The multitude of factors considered by the ALJ provide substantial evidence supporting his conclusion that Gittman-Crowther's own statements of her symptoms are unsupported by the record. Additionally, the ALJ was not required to cite findings from Gittman-Crowther's bowel resection surgery after the relevant period in his decision. Therefore, the court recommends denying Gittman-Crowther's motion for summary judgment and granting defendant's motion for summary judgment.

### iii.  Dr. Kanchana's Opinion

Gittman-Crowther argues that the ALJ erred in concluding Dr. Kanchana's summary of her limitations did not apply to the time period at or prior to March 2013. (D.I. 15 at 22) In the ALJ's examination, he concluded that "there is no indication that the limitations indicated were meant to apply through March 2013" when referring to Dr. Kanchana's statements in his April 2018 letter. (D.I. 9-2 at 22) In his letter, Dr. Kanchana states, "[b]efore, and as of, March 31, 2013, [Gittman-Crowther] has not been able to be gainfully employed in any capacity (whether skilled or unskilled) and otherwise could not engage in any substantial gainful activity." (D.I. 10-21 at 14) He goes on to explain limitations he believes would be required for Gittman-Crowther's participation in the workplace, and further stipulates that her "medical condition has essentially been unchanged prior to, at, and after March 31, 2013, even though the underlying symptoms may vary from time period to time period." (D.I. 10-21 at 14-15) The ALJ's characterization is inconsistent with the record because Dr. Kanchana expressly indicates that the limitations he outlines for Gittman-Crowther are meant to apply through March 2013. (*Id.*)

The standard of review for this case requires that the court affirm the ALJ's decision if it is supported by substantial evidence. *Monsour Med. Ctr.*, 806 F.2d at 1190-91. An error need not be reconsidered if it would not affect the outcome of a case. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Here, the ALJ erred in determining that Dr. Kanchana's limitations were not meant to apply through March 2013. However, this determination was just one factor in the ALJ's decision to give no weight to Dr. Kanchana's April 2018 medical source statements. (D.I. 9-2 at 22) In making his determination, the ALJ also looked to medical evidence discrediting these statements, the fact that Gittman-Crowther was only treated by Dr. Kanchana once during the relevant period, and the fact that no physical restrictions were mentioned in Dr. Kanchana's notes from that visit. (*Id.*)

The court considers the consistency of a medical opinion with the record as a whole in giving more weight to those opinions that are consistent with the record. 20 C.F.R. § 404.1527(c)(4). A treating sources opinion need not be given controlling weight if it is "inconsistent with other substantial evidence on [the] case record." *See Scouten v. Comm'r of Soc. Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (quoting 20 C.F.R. § 404.1527(c)(2)). The opinion of a treating physician does not bind the ALJ, and an inconsistent or conclusory opinion need not be given any deference. *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011). Here, the ALJ looked to notes taken by Dr. Kanchana during Gittman-Crowther's sole visit during the relevant period and observed that his general examination only points to "non-specific tenderness in lower abdomen." (D.I. 10-20 at 98-99) Dr. Kanchana did not note any physical restrictions or recommend any invasive procedures in these notes, instead recommending a high-fiber diet and a continuation of her existing medication regimen. (*Id.*)

25

The inconsistencies between Dr. Kanchana's notes from his only treatment of Gittman-Crowther during the relevant period and his subsequent medical statement completed in April 2018 provide substantial evidence in support of the ALJ's findings. *See Plummer*, 186 F.3d at 430. Accordingly, the ALJ's error in determining the applicable time frame of Dr. Kanchana's suggested limitations did not affect the outcome of the case, and substantial evidence weighs in favor of the ALJ's conclusion. Therefore, the court recommends denying plaintiff's motion for summary judgment and granting defendant's motion for summary judgment.

### iv. The ALJ's Hearing Errors

Gittman-Crowther argues that the administrative hearing process was defective and artificially limited the evidentiary record. (D.I. 15 at 23) Specifically, Gittman-Crowther contends that the ALJ interjected and terminated questioning by her attorney. (*Id.*) However, the transcript indicates that Gittman-Crowther's attorney stated "I have no other questions, your honor" before the ALJ began his own questioning. (D.I. 9-2 at 62) Gittman-Crowther's attorney terminated his own examination before the ALJ began questioning further and Gittman-Crowther's counsel failed to make an indication that he had more questions to ask or object to the ALJ's questioning. (*Id.* at 62-68)

Gittman-Crowther also points out that the ALJ was quick to dismiss her detailed descriptions in her testimony. (D.I. 15 at 23) The determination of RFC and disabilities are issues reserved for the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). It is not for the court to re-weigh Gittman-Crowther's testimony and its consistency with medical opinions, but rather to "determine whether substantial evidence exists to support the ALJ's weighing of those opinions." *Ransom v. Berryhill*, C.A. No. 17-939-LPS, 2018 WL 3617944, at *7 (D. Del. July 30, 2018) (citing *Gonzalez v. Astrue*, 537 F.Supp. 2d 644, 659 (D. Del. 2008)). The ALJ must

consider and weigh the non-medical evidence before him and is required to explain his reasons for rejecting testimony regarding subjective symptoms. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000); *See Van Horn v. Schweiker*, 717 F.2d 871 (3d Cir. 1983).  The ALJ determined that Gittman-Crowther's statements about the "intensity, persistence, and limiting effects of her symptoms" were unsupported by objective medical evidence.  (D.I. 9-2 at 20) In making this determination, the ALJ offered an expansive overview of Gittman-Crowther's medical records during the relevant period and found that medical evidence on record did not support Gittman-Crowther's own description of the severity of her symptoms.  (*Id.* at 20-23)

The ALJ did not quickly dismiss Gittman-Crowther's testimony about her limitations, but rather weighed it with the medical evidence on record and determined that Gittman-Crowther's representations contradicted the objective medical evidence showing no abnormalities during the relevant time period.  (*Id.* at 23) The ALJ also considered a state agency physical assessment indicating a capacity for light work and suggesting Gittman-Crowther's own statements about her symptomology were only partially credible because they were inconsistent with normal exam findings.  (*Id.* at 20-23; D.I. 9-3 at 13) Therefore, the court recommends denying Gittman-Crowther's motion for summary judgment and granting defendant's motion for summary judgment.

## V.    CONCLUSION

For the foregoing reasons, the court recommends DENYING Gittman-Crowther's motion for summary judgment (D.I. 14) and GRANTING the Commissioner's cross-motion for summary judgment.  (D.I. 16)

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The objection and responses to the objections are limited to ten (10) pages each.  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*)*; *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated:  July 14, 2020

_____
Sherry R. Fallon
United States Magistrate Judge